Good morning, Your Honors. May it please the Court. Jason Schwartz on behalf of Sunrise Senior Living. I'd like to reserve five minutes for rebuttal, Your Honor. Your Honors, the District Court incorrectly certified a class that included thousands of residents of senior living communities throughout California over seven years, 43 communities, each community with different neighborhoods that dealt with anything from minor assistance with day-to-day tasks to major assistance for seniors who were suffering from dementia and memory care disorders. Each individual had unique needs and was provided with unique services. The District Court's order rests on a three-legged stool. Each of those legs is broken, independently requiring reversal of the certification. The three legs, and I'd like to go through them in turn. Number one, the District Court made an error with respect to standing. Individualized issues with respect to standing predominate here. Number two, individualized issues with respect to each of the elements of the causes of action predominate here. And I would commend to Your Honor's attention the decision in the Steiner case, which I think is directly on point with that analysis. And then third, the District Court erred with respect to Dr. Kennedy's analysis of damages and the other expert work in the case. And I'd like to go through each of those in turn. With respect to standing, Your Honors, this Court obviously has a duty to figure out whether individualized issues predominate on standing. The plaintiffs do not want to talk about the individualized experience of each of those thousands of seniors because there's no way that that doesn't result in a multitude of mini-trials. Well, I don't know, but why is that individualized? Here's my understanding. The plaintiffs are saying, you can tell me if you disagree, the plaintiffs are saying, look, we bought a service, we paid money, okay? So there's a concrete and particularized payment that is classically a basis of injury in fact under Article III. And the reason our theory is we paid more than we should have because we were told by your client we're going to get a certain level of care when, in fact, your client had a back office chart with point systems and rounding down practices and all sorts of other things that actually gave us less care than we paid you to give us. That's not me. That's my understanding of the plaintiff's case. To me, there's just no question that that is not even close to transunion or spokio and is well within an injury in fact for Article III purposes. So the issue, Your Honor, is the plaintiffs did pivot to that theory. Risk of harm was originally their theory. It appears throughout their briefs, expert reports at district courts order and even on the briefs on appeal. But I understand your point, Your Honor. Their new theory is the harm happened at the time of the transaction because everyone overpaid for a defective service. Here's the problem with that. There are several fatal flaws. Number one, there is no evidence in the record that establishes that the class as a whole, you could uniformly determine that they overpaid. So if you look, for example, at... That's not the issue. The issue is they were induced to pay X not knowing that Sunrise had a back office program undisclosed to them that they would not get the services that they were paying for. They don't have to show on a case-by-case basis, as you seem to suggest, that an attendant came to my room when I hit the buzzer. That's not the... This is class... Look, class certification is answering one question. Does it make procedural sense to go forward as a group or do we do what we normally do and have individualized people bring their each or his or her own case? I just don't see any question that this is a classic consumer deception case and we've certified classes time and time again in exactly these circumstances. Now, you may win a trial. I'm not... It has nothing to do with the merits. But in terms of what's the right car to drive to court, it seems to me that it should be a van with all the plaintiffs in it. Understood, Your Honor. And the reason it's not here is a complete failure to show uniform proof on any of the elements. So if I might, Your Honor, the first suggestion that you made is that this is a case where everyone was made a promise and the promise was not those things in turn. The plaintiff's case is that every member of the class was harmed at the time of the transaction because they paid money and they received a deficient service. First of all, at the time of the transaction, the only common thread that the plaintiffs point to is that everyone signed a residency contract. Eight different contracts over a 10-year period, none of those contracts say anything about staffing. So then where the plaintiffs have to pivot is, well, I signed a contract. It said you were going to provide Let me follow up with that because isn't there an implicit promise within that contract that each resident has to go through a needs assessment that's conducted by Sunrise? And Sunrise comes up with a point system based on the variable needs that each person has. And isn't it an implicit promise within that contract that you're going to provide the level of service and staffing in order to satisfy that need that Sunrise itself says this resident has? And that seems to be a common question throughout all the residency agreements because it's all based on the same point system of need and you're implicitly promising that you're going to deliver on the staffing in order to meet those needs that people are paying. Why isn't that a common thing? Here's the reason why that's not common, Judge Sanchez. There's not a specific representation, so instead it's this impression that you're going to have staffing sufficient for the firm because I think this is dispositive. If you look at her affidavit, what she says is I signed the contract. I got an individualized assessment and services plan. It's going to vary for each person. I read different marketing materials and, quote, I believed everything the executive director of that particular community told me. That's an individualized representation. If you look at the rest of the class, some had information from community tours. Some took trial stays where they actually stayed in the Sunrise community for a couple of weeks. Some had discussions with staff or consultants. Some had a family member who lived at a Sunrise. There's this multitude of representations from different sources. So if you look, for example, at Mazza and Stearns, when you have that fact pattern, you have to evaluate it in many trials about what was represented and what they understood. I think this is quite distinct because, to be sure, there were individual speakers. They were all, as the district court said, working on substantially the same representations. Now, was it word for word the same? Of course not. There are different people involved, but they were all working out of the same Sunrise playbook, which is we'll take care of you or your loved one and we're going to provide the best possible service and we're you had a program that was going to do something that gave them less than what they paid for. So there's no question that there are individual speakers, but that doesn't mean that there's not substantial evidence that cuts across the class on the representations. So let me speak to both elements of that, Judge Donato. Number one, with respect to the communications, again, they're quite diverse. There is no uniform message other than this impression that there will be staffing to provide the services. As named plaintiff Fern said after she described the variety of individualized information she got, quote, your idea of adequate, mine and my mother's will all be different. So that's an individualized issue. And then if you look at what is supposedly the common thread, that the staffing is somehow deficient in a way that applies to the entire class, that completely falls apart. There's no class-wide proof. So what the plaintiffs tell you is we can identify a policy. First of all, points are not used throughout the entire class period. But what they say is we can identify a policy where they round down by a 2 percent. That has a 2 percent effect on the number of hours. Of course, they have to round in some way because you can't have a half of a person or a half of a shift work. But what they don't tell you is you can still get paid. But why not round up, though? So, I mean, it's a consumer deceptive action at the end of the day where the premise and what I would note is you mentioned Steiner. Steiner didn't have this proof of an internal policy of rounding down. And so I think there's a distinction there that seems significant to me, at least. But the idea is I'm paying for a certain number of points, but I'm not being told that I that the staffing is only good enough to get me to 70 or 80 percent of the points. You know, I'm making this up. And Judge Sanchez, the reason is because the factual record actually doesn't support that statement. So if you look at what's actually in the record, the plaintiffs say that the rounding results in a 2 percent effect. But what they don't tell you, and if you look at Dr. Ward's report, what you can see is that, okay, if the rounding is 2 percent, the other elements of material information are the following. That individual discretion at the executive director community level goes plus or minus 10 percent on 60 percent of days, so a 20 percent swing, way more than this 2 percent rounding. And on 40 percent of days, it's even more than 20 percent. So the idea that the rounding, it's just like those cases where you have a policy on paper, but then implement it at each location in a highly individualized way. So if you had to make a full disclosure to residents when they sign an agreement, here's what you would be saying. We want you to know that we have a system that calculates a target of hours for premium service. We round it down to the next whole person or shift. Then we give discretion to each individual community and manager. To a statistically significant extent, it varies and is not controlled by the target. Plus or minus 10 percent on 60 percent of days, over that on the other 40 percent of location, the plaintiffs concede at least 8 percent of the service hours are provided by persons who are not even within the target. This sounds more going to the weight of the evidence, and I think plaintiffs would say that they've got their own set of facts and expert testimony that says, no, that you cleave closely to the target hours and the target hours are themselves short of mark of what it actually takes. And so I don't see how that ultimately leads to us concluding that the district court abused its discretion on these common questions so much as these might be the defenses you might raise at trial. The reason that they diffuse the common questions is that we're entitled under Dukes and the Rules Enabling Act, of course, to present our individualized defenses. These are going to be different answers for each of the thousands of class members. And, Your Honor, if you look at- Okay, if you're right, then the district court can decertify during trial. This is a common thing. I mean, it doesn't happen very often, but this is an interlocutory certification. It's interlocutory until the verdict comes in. So if you achieve what you're telling us you intend to achieve at trial, you ask the court at that point to decertify. Again, we're just talking about the procedural going forward, and I'm not hearing anything that suggests to me this was an abuse of discretion to- you're asking us to disagree with the that applies here. Judge Donato, let me speak to the evidence, then, because the idea that the plaintiffs have presented class-wide evidence is not true. So what they tell you is that they presented class-wide evidence of a universal harm at the time of transaction, even for- regardless of what people paid for and regardless of what they received. What they cite is the district court's order. What the district court's order cites is the complaint. There literally is no evidence of a class-wide everybody overpaid. The other thing they cite is the exact same evidence that their expert, Dr. Kennedy, produced in the Steiner case, which Judge Gilliam found was a complete failure of evidence. And the reason for that is Kennedy says, I assume everybody overpaid, but I'm not going to analyze what the price should have been at the time of the transaction. If I may, you're arguing a summary judgment standard. That is not the plaintiff's degree. They need to propose a sound method of proving class-wide impact. They do not need to prove, as you just said, class-wide impact to get a class. That is just not right. They don't need to do that. And Judge Donato, they haven't proposed a method. Dr. Kennedy's methodology fails under Comcast because it does not prove damages at the time of the transaction, which is when they said that every single class member was injured, even those who got everything that they paid for. I don't think that's a fair characterization of Dr. Kennedy's work. He was quite clear in saying, as Tobacco II at the state level, and our cases adopting that have held, there will be a set-off. There's no doubt, as I read Dr. Kennedy's report, he agrees there was some value conferred, and the plaintiffs will not be paid for that value. He's going to do an offset, which is perfectly the right thing to do in a case like this where you got something but not everything that you were promised when you paid the money. And, Judge Donato, the problem with looking at it that way is that's an after-the-fact. We have to look at every class member's experience. We have hundreds of class members who said they got everything they wanted and more, and the statistics prove that, where you have, again, on 60 percent of days, a plus or minus 10 percent swing. So even if you accept the target as some sort of baseline, there are plenty of residents who got way more than they paid for. What the failure of proof here, the failure of common class-wide proof, is there's no proof that everybody at the time of the transaction overpaid. What Dr. Kennedy would have needed to propose was a method to figure out, like in Olean, for example, a consumer survey of what you would have paid if I told you all of those back-office things about how the formula worked. I don't think that's right. His formula was that we're going to, with Dr. Flores's, you know, help, we're going to figure out what would have been the amount of care they would have received for this amount of money versus what they actually got. That's a perfectly sound method, and I don't think you've demonstrated otherwise. They don't need to do, it's not a one-size-fits-all. You don't have to have a consumer survey. I will tell you, in my cases, I never see consumer surveys, and we certify classes all the time. That's just not a requirement under Rule 23. That's one way of doing it, to be sure. It is not the only way of doing it. Let me, I see I'm out of time. I reserve the rest of the time for rebuttal unless the panel has additional questions for me. Thank you. Good morning. Chris Healy on behalf of plaintiffs and appellees. Addressing a number of the points quickly, if I may. Council stated that there's nothing in the residency agreement that promises staffing in any of the residency agreements, and just to correct the record, that's not accurate. Every residency agreement at Sunrise after January 1, 2015, includes, by corporation of reference, the Resident Bill of Rights, which includes the right to sufficient staff in the facility. The record site is 5 ER 1027 for the incorporation, and then the resident rights provision is at 5 ER 1039. But back to the point that Judge Sanchez made, our claim really does, of deception, really does stem on the implications arising from the uniform provisions in the residency agreement, and these are in all of the various iterations, that there will be an assessment, that assessment will be used to set the scope of services and price those services, and our position is that gives rise to a reasonable consumer expectation that Sunrise will, in fact, use those assessments to set facility staffing. So we have both in play here. We certainly have the basis for a common consumer expectation. So how will the court go about figuring out what a reasonable consumer would have expected to pay for these services, had they known that there was some differential in the staffing? I am a little bit confused as to how that would happen, especially in the absence of a consumer survey, for example. Sure, and there is a strict rule in Clemens that consumer survey is not required to prove up likely deception. But to answer your question, Judge Sanchez, we have two monetary damage claims separate and apart from the statutory damage claims. The first is the upfront move-in fee that's paid by most, not all, but most of the class members, and to assess the damages for those class members on that damage claim, it's straightforward. You take the amount of the move-in fee that was paid. Our position is no offset is required for that component because there's no service rendered. The fees are paid before the resident goes into service. Isn't there some value to the needs that was assessed to the individual, for example? That's a fair point, and Dr. Kennedy addressed that, because in Sunrise's documents, they charge $500 for the cost of preparing the assessment and the service plan, and that's our fallback position. With regard to the second monetary claim for the service fee claim, and these are the care service fees that are paid monthly, so there's an ongoing injury when there's no disclosure of the Sunrise's formula. For those service fees, what we do is, again, look at the amount paid, and it's simply wrong. Sunrise's position, Dr. Kennedy's looking at the time of the transaction, at the point they pay, and then applying an offset as the calculated based on what we view as a staffing shortfall. We characterize, rather, as a staffing shortfall evidence, and that can be done in two ways. Dr. Flores described that in her declaration. One is the simple math calculation that she identified. The other is a more detailed one that we put together with Mr. Schroer's analysis, which is followed in U.S. Army, Mayo Clinic, and the like, and that looks at, on a facility-wide basis, this is where we part company, it's not looking at the specific services promised or delivered. Rather, it looks at the facility-wide staffing, because that's the nature of the harm. The deception is when Sunrise fails to tell residents and family members that they have this round-down policy and other defects, according to our expert, undercuts the capacity to deliver the services, which undercuts their ability to reliably provide adequate facility staffing. Let me ask this. Let's say the representation is you're going to provide adequate staffing, and at a facility, let's say the facility somehow manages to provide adequate services consistent with the needs that were assessed, despite the shortfall in staffing. Isn't Sunrise entitled to an offset for services rendered in that case? And the reason why I'm going there is because then that does seem to really reach into individualized inquiries about what services were given to a particular resident. I disagree that Sunrise is entitled to use individualized experiences on offset. I agree that there may be, at the trial court's discretion, anecdotal evidence on both sides as to the someone represents adequate staffing, and they're induced to sign a contract in reliance on that, and they overpay because the staffing isn't actually up to what they promised, but if the resident actually gets the services that they were promised under the needs, they've still suffered a concrete injury? Yes, they have, and Hinojos is the lead case on this following Kwikset, because what Hinojos and other cases stand for is that there's an economic injury when a seller of goods or services fails to provide an essential attribute of the sold service. In this case, the reliable adequate facility staffing is inextricably intertwined with the services that are sold. These are assisted living services, Your Honor, meaning the assistance with daily living, for example, the toileting assistance or grooming. It can only be provided by staff, so the staff here, there's a limited pool of staff per facilities that the care managers that provide these services, and so if you have a formula in place, which we allege and have presented evidence to demonstrate, that undercuts the capacity of Sunrise to provide adequate facility staffing, then you don't have the reliable staffing that people expect. But how does that square with California law that says that restitution require, you know, needs an offset for services rendered? Well, the services rendered are the failure to provide the up front, the reliable adequate facility staffing, because that's part of the bargain, and that is supportable under the case law and is supportable by the evidence, and if I can get to that, here Sunrise does not contest that adequate facility staffing is material, and their documents demonstrate that this round down formula is the means by which they purport to provide adequate facility staffing. That's one. Two, Hinojos, page 1107, tells us that defendants' marketing and legislative pronouncements are material, are relevant to this material, and that's it. It's got to be a material attribute. It's got to be a plausible claim. It's got to be a material attribute as has been provided, but here we have both. We've got the Sunrise marketing statements that are in the record that purport to provide 24-hour service all the time. They recognize that it's important to consumers that there be reliable facility staffing. So in your view, the class would never get into questions of what actual services were provided. The injury only took place at the initiation of the contract, and whatever happens later on has no bearing on that. My position, our position is that the economic injury occurs with the up front move-in fee transaction, and each month when there's the care fees that are charged without disclosure of the defective policy. That's an economic injury. Hinojos, Kwikset tell us that you don't look at events that occurred after the transaction, and it's not a defense from a defense perspective to say you've got to quote benefit of the bargain, because that ignores the up front economic injury. I thought your theory was each month they bargain for and pay an expected level of care, and then they don't get it. Now, it may be a trial, as we talked about a moment ago, that your colleague approves that everybody got great care, in which case you will not have carried your burden of proof on deception. So you lose, but that is not the issue in my view for 23B or 23A. The question only is, are you going to do that individually, or are you going to do that as a group, and do you have enough to have a common answer? That is the inquiry, as you know, under Dukes, it's not common questions, it's common answer. And what I hear you saying is you do, you can prove that people paid X, and in similar circumstances using benchmarks, whatever else Dr. Flores and Dr. Kennedy propose, you can say this is the normal value for that, and here's what they got, and it's Y, and there's a delta, and that's our harm, right? I mean, I know I'm oversimplifying, but that's it kind of in a nutshell. No, I agree, I agree, and to pick up on Judge Satchez's point, if there is evidence that the defendant provides, and up to this point they haven't put in an expert analysis to counter ours, but if they demonstrate their formula is adequate, we lose. If they have these happy declarations, but those declarations don't negate the economic harm, because none say, I was told about this formula and it didn't matter. That's the injury that's in play, but you're absolutely right. I mean, and materiality, as we know from Amgen, Stearns, is a question of fact. It's a quintessential common issue for classification, and it's one for America. Can I ask you, I think it was an amicus brief, there was a, might have been sunrise, one of the two, there was a hypothetical about an airline passenger, and challenging an airline policy if you overbook a flight, you know what I'm talking about? Yes, so how are we not, how is this case different? Well, the, in the airline scenario, there's disclosure by law required of the round, excuse me, the overbooking policy that airlines are entitled to apply. Here, there is no disclosure. The Sunrises has admitted that they do not The record site on that is 10 supplemental, so SER 238, excuse me, 2388-89, that's Mr. Slick's deposition, and in fact, when Sunrises came to this court, they sought a protective order to seal, keep under seal, their confidential round down policy, and that's appellate docket 30. There's the distinction there, and there was a reference to Dr. Ward, and the issue there, that district court probably did not find that persuasive. Dr. Ward focused on daily staffing to come up with these numbers. If you look at his declaration, when you look at the, over the full time period, he acknowledges, paragraph 18 of his declaration, that the Sunrise monthly data show all facilities were very close to this 10% schedule attainment record that's part of the Sunrise policy, and the record site on that is 14 ER 3382-3. So the, if I may, this notion that we have to quantify the injury is inaccurate. Hinojo says there's no value quantification required. On Bonk, Ninth Circuit, and Hyundai essentially came to the same conclusion, that we don't have to quantify the injury. That was in the context of a class cert, excuse me, a class settlement approval. So that, that's simply wrong. We don't have to do that. Let me ask, can I ask you about the financial elder abuse claim? Yes. How, how is that susceptible to class-wide treatment if part of the element is requiring a determination as to whether property was taken from an elder? I was having, you know, I, I think the district court focused on the first side of an intent to defraud, which I wouldn't disagree, you know, can lead to common resolution. But what about the second half? Do you have a problem with that? Well, there's, no, I don't believe we do, Your Honor, because the uniform evidence is the resident, under the residency agreement, the resident is the obligor. The resident must pay. And the, the family member can't pay, a family member is not a part of your contract? They can, Your Honor, but the starting point is, it's the resident's obligation, and that's in, for example, the Zach residency agreement, the site there is 5 ER 1021. But then beyond that, Your Honor, the, the restatement of contracts. Let me, let me give you an example. It's a hypothetical. A family member pays for the resident. And so I, I guess assuming, maybe, maybe you'll disagree with me, but there's no property taken from the resident themselves because this deceptive act impacted the person who signed the contract and paid for it. What, why would they be within this class if, if it was the family member that paid on just a financial elder abuse claim? Right. First part is, as I say, the, the starting point is the resident paid, but under the restatement of contracts second, section 318, the presumption is that if one, if an obligor delegates that payment by the family member is deemed to be payment by the, the initial obligor, in this case, the resident. But beyond that, in the context of what the district court did, and I acknowledge, she focused a bit more on this intent issue, but the evidence didn't warrant anything further from the defendants. They have four declarations on this other payor issue. If you look at them, those declarations simply say, I paid. It doesn't say, I paid from my own funds and my, my elder, my family member paid none, which is what they need to do to move their, their, to make this argument. Van tells us that you can't raise individual issues based on speculative or minimalist evidence. And beyond that, Olene tells us that even if there is an individual issue presented, even one affecting... Can I just, I just want to, sorry, I want to go back just one second. I'm still a little confused about the elder financial abuse issue. So, I mean, it's not common to, say, have an indigent parent and well-off kids. And so, there's just no question that the kids are paying to take care of the indigent parent. Now, why, why, what case under California state law says that would constitute elder abuse? If, of course, the elder is receiving the care, but from day one, the kids are paying for it. They're not using any elder money. There's no, no way, shape, or form that older person is paying for. It's just a gift from the kids. How does that amount to elder abuse? Well... Do you have a case that says something like that? No. If the, if the evidence truly is that the funds are not of the elder, then I agree that in that circumstance, that, that elder does not have the claim for financial elder abuse. Still has the claim, but he doesn't, it doesn't, we don't get to the point of overturning the district court's decision unless they provide competent evidence to get there. That's one. Two, it seems to me this is an issue that the trial court can deal with down the road if, in fact, there's evidence that has been presented that warrants the type of argument you're suggesting, Your Honor. So they would just, they would just be excluded from the class. They could be excluded from the class. There could be a summary judgment. Put a finer point on it. The class could be defined to exclude anyone who was getting a gift from another payor. If, if the evidence warranted it, and, and after the trial court heard me on my argument under Restatement of Contracts 318, which I just presented to you cold because it came up in the reply. So I think at this point there's not enough to overturn the exercise of the court's jurisdiction on this issue, and quite frankly any others, and this is an issue that can be handled down, down the road. In close, I don't have to remind this court, this panel, of the deference accorded to the trial court on her grant of class certification. Unless there's any other questions of me, I'll yield. Thank you, counsel. Mr. Schwartz, you have the last word. Thank you, Your Honors. Five quick points I want to make. Number one, this is not a product defect case. This is a risk of harm case. We're talking about the delivery of complex services to thousands of individuals. Whether you disclosed all of those facts about the formula doesn't tell you anything about damage at the time of the transaction. Hinojos, also easily distinguishable there, there's a specific lie, right? This item is on sale when it's not, and it's a specific product. Number two, whether, even if you believe that the policy, the staffing policy, in the abstract creates some amorphous question, its application varies by community, again, to a statistically significant percentage across community, neighborhood, executive director, and time. So all you really have is this theoretical risk that you need to look at the individual experience to determine. Counsel, I'll go back to your first point there. Of course, Your Honor. You said that this was distinguishable because in the Hinojos case, there was that lie that you indicated, whereas here, there's a failure to provide information to these individuals. So failing to provide information in your mind is not the same thing as a lie. Well, in these circumstances, Judge Mendoza, because there are hundreds, literally hundreds of residents who received exactly what they paid for, by any measure, including if you looked at the staffing, it was up to 10% or more above the target. So even if you say they somehow were paying for a formula, they got more than the formula. There was no lie. There was no omission. Again, if you wanted to give them the full context, it would be that actually this formula is not dispositive because there are all these other factors that control. Then why not disclose it? If it's not a lie, why not disclose it? Because a reasonable consumer is not interested in those exact details, Your Honor. They're not interested in what services they're going to be receiving based upon the staffing formulas? They're absolutely interested in the services, Your Honor, but this gets to the exact point. You'd have to go person by person across those thousands of people, many of whom said they got exactly what they wanted. In Dr. Kennedy's formula, he wants to have it but I'm going to calculate it based upon the staffing after the fact, and I'm going to prohibit you from presenting your individualized evidence that people were happy. What he says, quote, in his deposition is he would award damages to every class member in a possibly understaffed community, even if the resident received exactly the services that they paid for, Your Honor. If you look at all of their I just don't think, I read his report and he was quite clear that he's going to give you full credit for services rendered, and if there is an overcharge, then you will pay. That goes for the one-time only move-in fee. It goes into the monthly bills. He was crystal clear on that. I do not think that, I think you're over-reading whatever that line is in the deposition because the report is quite the contrary. Respectfully, Judge Donato, I disagree, and if you look at even what my colleague said that we're now going to look at the monthly service fees, well, that means, again, I get to present the individualized evidence of what happened each and every month. So if the contention is some class member formed an impression about adequate staffing from a contract at the time of move-in, and then they stayed there month after month after month and saw the exact staffing and received exactly what they paid for, I'm entitled to present that on a person-by-person basis, which means the individualized evidence, both as to the elements of these causes of action and as to their constitutional standing under Olien, are going to predominate and overwhelm the proof. I'm not sure I agree because, to get to Judge Donato's point, if you're dealing with the damages model that treats the injury being the deceptive act of the promise and not providing disclosures about actual staffing, and I would agree that there could be some individualized inquiry about the offsets that Sunrise might be entitled to, but our cases have said that individual damages injuries shouldn't defeat class certification. So as long as you've established the common damages model and then it leads to some sort of individualized inquiry at the back end to carve some of that back, why is that improper on a class-wide basis? Judge Sanchez, because it's not just the back-end damages, it's whether there was injury at all. So what did they understand when they moved in? Now, what did they understand each and every month that they lived there? What did they receive on an individualized basis and did it meet their expectations? All measured according to the plaintiffs now, because they want to ignore that, at the time of the transaction. What we've presented evidence is at the time of the transaction, everyone was presented with a multitude of different information, often depending upon their needs and what they were looking for. The tours, the visits, the assessments, the conversations, all of those things highly individualized that we are entitled to present as a matter of whether they have a cause of action and whether they have constitutional standing. It's not just a damages calculation. Let me just make two final points, Your Honors, if I might. Number one, on the elder financial abuse, this is one where Judge Gilliam correctly found, Judge Sanchez, as you were asking, that the individual payor is dispositive here and it's a highly individualized issue. And then lastly... Well, you just defined the class. I mean, you can fiddle with the class definition. I don't see that as being a certification issue. Yes, of course, that's true. I agree with my colleague, Judge Gilliam, but so what? I mean, how does that defeat certification? Well, it's going to require person-by-person inquiry. There's no classified evidence. No, you define the class to exclude that. I mean, it's easy to do. Your Honor, let me lastly talk about Dr. Flores. You said there's class-wide evidence of the supposed understaffing that everybody relies upon. Dr. Flores had three inputs. Her own memory of what happened in her six-bed house. Number two, her time study in her six-bed house that she admitted was not statistically significant. And number three, her cherry-picked samples from literature that she could not identify. She admitted in deposition that when she said she averaged those things, that was not true. She just picked them and came up with a penumbra. That is not a scientifically reliable, testable, or duplicatable method. And so therefore, both under Daubert, it's not admissible, but even if you admitted it, under Ellis, it has no persuasive value to say that there's class-wide evidence to prove some understaffing. The most that you can prove, even if that evidence was reliable, was a risk. She has a doctorate in providing nursing care. She's run multiple facilities. She's got a lifetime of experience. That is a classically proper basis for getting an expert certified. Judge Donato, she ran a six-person house, and she admitted that she cherry-picked the numbers. You have great cross-examination at trial, but I don't think that's a barrier to being admissible. Understood, and I respectfully disagree, but I would say ultimately, even if you were to look at that evidence, the most the plaintiffs have proven is that people were at risk, and they want to have it both ways, that somehow that happens at the time of the transaction, but they get to use the evidence afterwards to calculate whether they were injured. That doesn't work under TransUnion. It doesn't work under OLEAN, and the individualized issues predominate here. Thank you, Your Honors. Thank you both for your helpful arguments. The matter will stand submitted, and court is adjourned. All rise. This court for this session stands adjourned.
judges: SANCHEZ, MENDOZA, Donato